# MANUEL ANDRADE *v.* OAHU RAILWAY & LAND COMPANY, A CORPORATION.

## No. 1458.

### ERROR TO CIRCUIT COURT FIRST CIRCUIT.
### HON. J. J. BANKS, JUDGE.

ARGUED JUNE 25, 1923.                    DECIDED AUGUST 23, 1923.

### PETERS, C. J., PERRY AND LINDSAY. JJ.

RAILROADS—*operation—respective rights and duties of railroads and travelers at street crossings.*

> Travelers upon a common highway which crosses a railroad upon the same level, and the railroad company running a train, have mutual and reciprocal duties and obligations; and, although the train has the right of way, the same degree of care and diligence in avoiding a collision is required from each of them.

SAME—*same—same.*

> That right does not, therefore, impose upon such a traveler the whole duty of avoiding a collision, but is accompanied with and conditioned upon the duty of the train to give due and timely warning of its approach.

SAME—*same—same.*

> The degree of diligence to be used on either side is such as a prudent man would exercise under the circumstances of the case in endeavoring fairly to perform his duty.

SAME—*same—accidents at crossings—signals.*

> Trains crossing public highways must give due and timely, in other words, reasonably adequate, warning of their approach. Failure to do so is negligence.

SAME—*same—same—contributory negligence of traveler.*

> Where a traveler upon a public highway upon approaching a railroad crossing looks and listens when looking and when listening may have been effective, his subsequent failure upon reaching the crossing to stop and wait for a train which had just passed to recede sufficiently to afford him an unobstructed view of the railroad's right of way and to satisfy himself that a train is not approaching the crossing in the opposite direction does not constitute negligence as a matter of law. It is a question of fact for the jury.

This is an action brought by the plaintiff for damages sustained by him by reason of the death of his wife and injuries to his automobile caused by the alleged negligence of the defendant railroad company.

Paragraph II of plaintiff's complaint is as follows:

"That on the 19th day of April, 1922, the said defendant, while operating, through its agents and servants, a certain train of railway cars owned by it and propelled by steam as aforesaid, between Puuloa aforesaid and Honolulu aforesaid, and at the intersection of said right-of-way of said defendant with that certain public highway, in the City and County of Honolulu, known as and called Puuhale Street, then and there wantonly and negligently, through its agents and servants, drove and propelled its engine and train upon and against plaintiff and Mary F. Andrade, then the lawful wife of plaintiff, while said plaintiff and his said wife, lawfully proceeding along said Puuhale Street, were, in the exercise of due care, crossing said right-of-way, and, without first sounding any adequate alarm or giving any adequate signal or warning of the approach of said engine and train, struck the automobile owned by plaintiff in which the plaintiff and his said wife were riding, crushing and destroying same, painfully wounding plaintiff, and striking the said Mary F. Andrade, plaintiff's said wife, with such force as to cause her instantaneous death."

At the conclusion of plaintiff's case the trial court granted an involuntary nonsuit upon the ground that the only reasonable inference of which the evidence was capable was that plaintiff's negligence was the direct and proximate cause of the death of plaintiff's wife and injury to his automobile. The alleged negligence of the defendant was not passed upon.

Plaintiff prosecuted error. The parties shall be referred to herein by the same terms as applied below.

The assignments of error present the single question of whether or not plaintiff made out a *prima facie* case of negligence upon the part of defendant and if so

whether, even though the defendant may have been negligent, the plaintiff was also guilty of negligence directly and proximately contributing to the wrong complained of. This determination rests solely upon the evidence adduced by plaintiff, which not only must be conceded to be true, but to it must be accorded every reasonable inference in plaintiff's favor of which the same is capable. 4 C. J., title "Appeal and Error," Sec. 2707, p. 763.

A resume' of the evidence adduced is in order.

It is undisputed that at the time alleged the defendant maintained and operated a steam railroad on the island of Oahu between Honolulu and Kahuku and that the plaintiff's wife was killed and his automobile wrecked in a collision between his automobile and a train of the defendant at the intersection of the company's right of way and Puuhale street, a public highway in Kalihi.

Kalihi is one of the districts of which Honolulu is composed, the portion with which we are concerned lying between King street and the sea and northerly of Waipilopilo street which runs westerly from King street. The streets in the district to the northerly of Waipilopilo street and parallel to it are Kalihi, Mokauea and Puuhale streets, in the order named. Defendant's right of way passes through the district. Waipilopilo street ends at the railroad. Mokauea street intersects the defendant's right of way but the latter marks the limitation of traffic westerly on that street. Kalihi street is used only for a couple of hundred feet below the tracks. Between the right of way and the sea and running north and south are streets intersecting Puuhale street and tapping the territory below the ends of Kalihi street and Mokauea street.

. Puuhale street is one of the important streets, if not the most important, in Kalihi. It is the first street of Honolulu proper that the railroad crosses coming into town. It leads to the Kalihi receiving station where it

turns to the left and goes to the sea. It is the only street in Kalihi of those named that gives access to the sea beach. Immediately adjacent to Puuhale street and between King street and defendant's right of way is very thickly populated. Below the right of way that is toward the sea it is not so thickly populated. On the street itself there is but one house. Off the street, however, there are a lot of houses; there are some pig jobbers, men raising pigs and poultry, and fishermen's camps. There are also a crematory, salt works and slaughter-houses. The traffic on Puuhale street is very heavy. Besides the use of the crossing made by the people living or working between the right of way and the sea many others use it when resorting to the Kalihi receiving station and the other places named. The number of pedestrians crossing the right of way at Puuhale street was estimated variously at 10 to 40 per hour and it was said that many trucks and automobiles cross also.

Defendant's right of way runs northwest and southeast. The north angle of its intersection with Puuhale street is about 10 degrees less than a right angle. At a distance of about 1137 feet northwest from the intersection the right of way curves flatly to the left. To a pedestrian on the street between the prison building hereinafter referred to and the intersection the extreme point of visibility of trains on the right of way to the northwesterly, measured along the middle line thereof, is 5446 feet from the intersection and may be determined by prolonging northwesterly a line drawn from Puuhale street touching the southwest end of the bleachers in the prison yard, more particularly hereinafter located, and crossing the middle line of said right of way about 750 feet from said intersection. Puuhale street at the intersection is 25 feet wide, the right of way 40 feet wide. The right of way has two tracks, one approximately in the middle and

18 feet from the easterly line of the right of way, the other between it and the westerly side of the right of way. Whether each track is used for trains going both ways or only one way, or whether one is a main track and the other an extra track does not appear. As far as the record discloses, the approaches of both the right of way and Puuhale street to the intersection are level except that some 300 feet northwesterly from the intersection the grade of the right of way drops to meet the level of the rice fields beyond. At the intersection the company maintains a "stop, look and listen" sign and a device consisting of a bell and pendulum which are automatically set in motion by trains traveling over either track when within about 1000 feet of and on either side of the intersection and both when approaching toward and receding from the intersection. The former is on the north corner; the latter on the south corner of the intersection. There are no safety gates to stop traffic over the crossing when trains are passing nor does the company maintain there any flagman to warn travelers of the approach or passing of trains to and over the intersection.

Permanent structures in the prison premises adjoining the northwesterly side of Puuhale street, bougainvillea vines and trees prevent train crews on trains coming from the northwesterly on the one hand and travelers approaching the crossing on Puuhale street from the easterly from having free and unobstructed views of each other. This may be best appreciated by a description of the northwesterly side of Puuhale street. The Oahu prison premises occupy the northwesterly side of Puuhale street between Queen street and the railroad's right of way. Queen street is the first street easterly of and parallel to the company's right of way. The prison proper, a rectangular building, occupies the southwest corner of Queen and Puuhale streets. Its longest side runs

parallel to and 50 feet back from the latter street. This building is 400 feet long and 212 feet wide. There is a fence running from the south corner of the prison along the line of its southwesterly wall to Puuhale street, the point of intersection of this fence with Puuhale street being 287 feet from the intersection of the street and the company's right of way. Below the prison building is the prison yard inclosed by the fence before referred to running from the south corner of the prison to Puuhale street and a fence along Puuhale street and along the easterly line of the right of way. The Puuhale street fence is covered more or less with bougainvillea vines. Along the northeasterly side of the right of way near the intersection are four or five algaroba trees six or seven feet high. Within the prison yard are a warehouse, baseball bleachers and a band stand. The bleachers are about 75 feet long and the warehouse 100 feet long. Both lie along their greatest length parallel to Puuhale street, the former being about 300 feet from Puuhale street and 120 feet northeasterly of the right of way, the latter 85 feet further to the rear and about 110 feet northeasterly of the right of way. The band stand is of the usual size and abuts the right of way 185 feet from Puuhale street. A person walking down Puuhale street from Queen street toward the railroad tracks, if observing to his right, would first locate the company's right of way to the northwesterly when about 312 feet from the intersection and 10 feet back from the short fence running from the south corner of the prison. The bleachers and warehouse, however, confine the angle of vision so that provided one could see through the bleachers and past the southerly corner of the warehouse which would mark the extreme view to the right 675 feet of the right of way to the northwesterly of the intersection would be visible. If the southwesterly corner of the bleachers marks the extreme

view to the right, the right of way subject to view would be about 100 feet shorter.   From here down to the intersection observation is intermittently interrupted by intervening bougainvillea vine on the prison fence.   There are but three open spaces in the bougainvillea vine through which a pedestrian may obtain a clear and unobstructed view to the northwest which, for the purposes of subsequent reference, may be identified by number in the order found, the first 12 to 15 feet long, the second 70 feet long and the third 60 feet long, the middle points of which are respectively 275, 175 and 80 feet from the intersection. At the first opening the bleachers and warehouse still confine the scope of observation but the angle of vision has broadened, the right of way from the intersection being visible for about 700 feet from the intersection.   At the second opening the warehouse and bleachers are practically opposite the observer and the angle of vision is almost a right angle to Puuhale street, thus affording observation of a train within 5446 feet northwesterly of the intersection, further view of the train along the right of way being obscured by trees and shrubbery.   Similar observation may be made from the third opening.   From the third opening to the intersection bougainvillea vines prevent observation of the company's right of way to the observer's right.   An occupant of an automobile 20 feet from the upper track and 2 feet back from the south corner of the prison yard, while unable to see the railroad tracks, could observe the approach of a train from the northwest when some 300 to 400 feet from the intersection.   A pedestrian emerging into the intersection and when 5 feet above the track can see the railroad tracks for a distance of about 1400 feet.

It was daylight when the accident happened.   The plaintiff was driving a 5-passenger 6-cylinder Buick down Puuhale street toward the right of way on his way to the

Kalihi receiving station below. The car was a left-hand drive. The plaintiff's wife sat to his right and the latter's sister and her child sat in the rear. While passing the Puuhale street entrance to the jail, which is some 400 feet above the railroad crossing, the plaintiff heard the whistle of a locomotive to the left coming from the southeast, the direction of town. He thereupon slowed his automobile down to less than 12 miles per hour. While passing the second clear space which the plaintiff estimated to be about 150 feet from the railroad tracks, he looked to the right to see whether or not there was any train and there was none in sight. Arriving at a point about 20 feet from the upper track the plaintiff brought his machine to a standstill, disengaging the gears, but permitting the motor to run. After the train from the southeast had passed the crossing and had receded about 100 feet northwesterly therefrom plaintiff started forward on his low gear to continue down Puuhale street and across the tracks of the company. When about 8 or 10 feet from the tracks he looked both ways and seeing only the receding train some 150 feet away to the northwest, proceeded across the tracks giving his undivided attention thereafter to the latter on account of the bumpy condition of the crossing. While passing over the lower track a train from the northwest bound toward the southeast struck the automobile carrying it some 300 to 400 feet before the train came to a standstill. The plaintiff was familiar with this crossing, having previously for about seven months used Puuhale street twice a week to go to the Kalihi receiving station, nearly always at about the same time as the time of the accident or a little later. He knew there were two tracks and had seen trains on both but not together and never passing each other at the crossing. Plaintiff had seen trains on the tracks with the automatic signal indicating their approach and knew that as soon as

the signal rang the train was within a short distance of Puuhale street.  Plaintiff explained his failure to see the southeast bound train when he looked to the northwesterly when 8 or 10 feet from the upper track by saying that the train bound southeast must have been hidden by the northwest bound train on the curve; that the train bound northwest, the band stand and trees on defendant's right of way obstructed his view.  When the plaintiff started across the tracks of the defendant the bell was still ringing and the pendulum swinging.  His eyesight and hearing were good.  He estimated that a half to a minute and a half elapsed from the time that he looked to the right at the second opening in the fence on the westerly side of Puuhale street and the time that he was struck by the train.  He admits that he did not look through a 50 foot opening to his right which apparently was the third opening on the northwesterly side of Puuhale street.

The evidence tended to show that the bell of the train bound northwesterly was sounding as it passed but the train from the northwesterly neither sounded a bell nor blew a whistle, and that there were no safety gates at the crossing nor flagman to warn travelers of approaching trains.  The evidence tended further to show that the intersection at which the accident happened is between the terminus of the railroad in Honolulu and the first station known as Puuloa on the westerly.  That the distance from Puuloa to Honolulu is six miles and, according to the company's time-table, the train should have left Puuloa at 5:15 P. M., to arrive at Honolulu at 5:27 P. M. The conductor's schedule disclosed that this train was a minute late in leaving Puuloa.  Witnesses testified that at the time of the accident the train was traveling at a rate of from 40 to 45 miles per hour.

The first question that must be determined is whether the defendant was negligent in the operation of the train

which came in collision with the plaintiff's automobile. If the defendant was not negligent, obviously the question of contributory negligence does not arise.

Negligence involves the invasion of the legal rights of another or a breach of duty that one owes such other in respect to such rights. From the status sustained by each of the parties hereto and their legal relation to each other there arose by implication of law certain mutual and reciprocal rights and duties. The rights and duties of the respective parties hereto must be measured by the status which they respectively sustained as persons lawfully using a public highway. These respective rights and duties are best expressed in the case of *Continental Improvement Co.* v. *Stead,* 95 U. S. 161, 164. "If a railroad crosses a common road on the same level, those travelling on either have a legal right to pass over the point of crossing, and to require due care on the part of those travelling on the other, to avoid a collision. Of course, these mutual rights have respect to other relative rights subsisting between the parties. From the character and momentum of a railroad train, and the requirements of public travel by means thereof, it cannot be expected that it shall stop and give precedence to an approaching wagon to make the crossing first: it is the duty of the wagon to wait for the train. The train has the preference and right of way. But it is bound to give due warning of its approach, so that the wagon may stop and allow it to pass, and to use every exertion to stop if the wagon is inevitably in the way. Such warning must be reasonable and timely. But what is reasonable and timely warning may depend on many circumstances. * * * On the other hand, those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching. * * * The obligations, rights, and duties of railroads and travellers upon intersecting highways are

mutual and reciprocal, and * * * no greater degree of care is required of the one than of the other.   For, conceding that the railway train has the right of precedence of crossing, the parties are still on equal terms as to the exercise of care and diligence in regard to, their relative duties. The right of precedence referred to does not impose upon the wagon the whole duty of avoiding a collision.   It is accompanied with, and conditioned upon, the duty of the train to give due and timely warning of approach.   The duty of the wagon to yield precedence is based upon this condition.   Both parties are charged with the mutual duty of keeping a careful lookout for danger; and the degree of diligence to be exercised on either side is such as a prudent man would exercise under the circumstances of the case in endeavoring fairly to perform his duty. * * * The mistake of the defendant's counsel consists in seeking to impose upon the wagon too exclusively the duty of avoiding collision, and to relieve the train too entirely from responsibility in the matter.   Railway companies cannot expect this immunity so long as their tracks cross the highways of the country upon the same level.   The people have the same right to travel on the ordinary highways as the railway companies have to run trains on the railroads."

A "due and timely warning" is one which is reasonably adequate to effect the purpose which its exercise is designed to accomplish.

That in the instant case the vehicle involved was an automobile and not a wagon does not alter the situation further than the character of the vehicle and its adaptability to diligence on the part of the driver affects the question of due care.

What is a reasonably adequate warning depends upon the individual circumstances of each particular case, and whether a warning is reasonably adequate must be deter-

mined by the test of what warning a reasonably prudent person would give under similar circumstances. Negligence is defined as that failure to do what reasonable and prudent persons would have ordinarily done under the circumstances of the situation, or doing what reasonable and prudent persons under the existing circumstances would not have done. Similarly expressed, it is a failure to exercise due care. What might amount to due care under some circumstances, however, might constitute negligence under others. Neither the Territory nor the city and county has prescribed the character of warning that should be employed by steam railroads crossing public highways to notify persons lawfully using the highway of their approach, so that the adequacy of the warning employed in the instant case must be determined by the conditions existing at the particular crossing at which the accident happened together with all the other surrounding circumstances of the case.

Obviously, natural conditions that may increase the dangers at the crossing correspondingly increase the degree of care which must be exercised by railroad companies in giving warning of the approach of their trains such as permanent and temporary obstructions to mutual observation.

"The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train." *Continental Improvement Co.* v. *Stead, supra.*

Another condition that may increase the degree of care which must be observed is traffic over the crossing rendering it extra hazardous.

"The doctrine with reference to injuries to those crossing the track of a railway, where the right to cross

exists, is that the company must use such reasonable care and precaution as ordinary prudence would indicate. This vigilance and care must be greater at crossings in a populous town or city than at ordinary crossings in the country; so what is reasonable care and prudence must depend on the facts of each case." *Central Passenger Ry. Co.* v. *Kuhn,* 86 Ky. 578, 589.

Moreover, the rate of speed may affect the adequacy of the warning. The efficient performance of the business of carriage of passengers and freight for hire by steam railroads requires rapid transportation. While trains have a preferential right at crossings, that right is not absolute and does not absolve those in charge of trains from exercising due care. With increased speed the degree of care required in giving warning of approaching trains correspondingly increases. Where a railroad company desires to maintain a high rate of speed while traveling across public highways it should give warnings that such speed reasonably demands.

On the other hand, the traveler upon highways intersected by railroads must observe care which is commensurate with the danger involved. Railroad tracks are places of danger. Trains have a preferential right of way at such crossings, hence a traveler approaching the crossing must utilize his senses and advise himself of the approach of trains. *Railroad Co.* v. *Houston,* 95 U. S. 697, 702; *Schofield* v. *Chicago & St. Paul Railway Co.,* 114 U. S. 615; *Northern Pacific Railroad* v. *Freeman,* 174 U. S. 379.

He must look and he must listen. And he must look and he must listen when looking and when listening are effective. *Winter* v. *N. Y. & L. B. R. R. Co.,* 66 N. J. L. 677, 679; *Central of Georgia Ry. Co.* v. *Forshee,* 27 So. (Ala.) 1006.

And similarly, as in the case of those in charge of trains, the degree of care to be exercised in looking and

in listening correspondingly lessens or increases accordingly as the view is free and open or is temporarily or permanently obstructed.

In the instant case it appears from the evidence that the train involved in the accident was traveling at from 40 to 45 miles an hour at the time it crossed Puuhale street. Two witnesses gave negative evidence to the effect that they did not hear either bell or whistle. This evidence was sufficient, however, to sustain a finding that neither was sounded. *Duffy* v. *The Chicago & Northwestern Railway Company*, 32 Wis. 274, 275.

The only warning given of the approach of the train from the northwest was the automatic device which impartially heralded both the approach and departure of trains in either direction, on either track, on either side of the intersection. An element of adequacy is certainty. Whether while traveling at a rate of speed of from 40 to 45 miles an hour it was negligence to omit to sound whistle or bell and rely upon the signal device at the corner was a question of fact for the jury under all the circumstances of the case. If the warning employed was not reasonably adequate in view of the speed of the train and such permanent or temporary obstructions as existed at or immediately adjacent to the crossing, then plaintiff made out a *prima facie* case of negligence on the part of the defendant. We cannot say as a matter of law that the defendant was free from negligence. Whether it was guilty of negligence should have been submitted to the jury. Nor can we say as a matter of law that the plaintiff was guilty of negligence directly contributing to the wrong complained of.

Whether he looked and listened when looking and listening were effective was a question of fact for the jury. He listened for the entire time he was below the prison building and while approaching the right of way. He

looked when obstructions gave way to an unobstructed view of over a mile to his right. No train coming from the northwest was then within a mile of the intersection. At the rate of speed at which he was traveling the time required in traversing the 175 feet to the intersection and in crossing the right of way, including the momentary stop to allow the train from the southeast to pass, could consume but a short time. The plaintiff placed it from a half a minute to a minute and a half. When emerging upon the right of way he again looked and listened. No train was visible from the northwest nor was there smoke or noise indicating its approach. The agitation of the automatic signal was consistent with the presence of the train from the southeast which had just passed the crossing. We cannot say as a matter of law that the plaintiff was negligent in not stopping and waiting until the train which had just passed had sufficiently receded to afford him an unobstructed view of the right of way of defendant to the northwest. He had a right to rely to some extent upon what his senses had assured him in looking and listening prior to emerging into the right of way. If his view to the right from the second opening was effective, and if his conduct thereafter up to the time of the collision was such as one might expect of an ordinarily careful and prudent man, then the plaintiff was not negligent.

This is not a case of an automobile driver making a dash over a grade crossing as in *New York Cent. Etc.* v. *Maidment,* 168 Fed. 21, and *Brommer* v. *Pennsylvania R. Co.,* 179 Fed. 577, cases cited by defendant. Nor do the former decisions of this court permit the adoption of the minority rule obtaining in Pennsylvania and elsewhere that a plaintiff is negligent as a matter of law in every case if he does not stop, look and listen before crossing a railroad track, enunciated in *Pennsylvania Railroad Co.* v. *Beale,* 73 Pa. St. 504; *Reading and Columbia R. R. Co.*

v. *Ritchie,* 102 Pa. St. 425, and apparently followed by the United States circuit court of appeals for the third circuit in the *Maidment* and *Brommer* cases, and *Philadelphia & R. Ry. Co.* v. *Le Barr,* 265 Fed. 129. To so hold would, in our opinion, be an unwarranted interference with the province of the jury. Unquestionably a driver of an automobile who without any previous opportunity of observation, or having such opportunity and failing to exercise it, proceeds to cross a double track railroad crossing without stopping and waiting for a passing train to recede sufficiently to permit a clear and unobstructed view of trains coming in the opposite direction may, under certain circumstances, be guilty of negligence in failing so to do, and if as a result of such omission he is injured, he would not be entitled to recover. But this is not such a case. Here the plaintiff did not "make chance instead of stopping and looking" the guaranty of his safety. He looked and listened at a time and place when looking and when listening may have been effective. His conduct when emerging into the defendant's right of way should not be considered to the exclusion of his previous acts. To do so would be both unfair and unreasonable. There are many other factors to be considered in determining whether or not he exercised due care.

The involuntary nonsuit was improperly granted.

Plaintiff's exception to the granting of the nonsuit is sustained and the cause remanded for a new trial.

*W. B. Lymer* (*Watson & Lymer* on the briefs) for plaintiff in error.

*A. E. Steadman* (*Frear, Prosser, Anderson & Marx* on the briefs) for defendant in error.